| | |
|---|---|
| MICHAEL A. CLARK, Admr. | Case No. 2015-00099JD |
| Plaintiff | Judge Patrick M. McGrath |
| v. | <u>DECISION</u> |
| OHIO DEPARTMENT OF TRANSPORTATION | |
| Defendant | |

{¶1} Before the court is defendant Ohio Department of Transportation's (ODOT) motion for summary judgment and plaintiff's motion for partial summary judgment, which seeks a determination only as to liability. The motions have been fully briefed and are based on the same set of facts and evidence and present the arguments of the parties. The court, therefore, addresses them collectively herein. For the following reasons, the court shall grant ODOT's motion for summary judgment and deny plaintiff's motion for partial summary judgment.

{¶2} In 2015, ODOT hired Kokosing Construction Company, Inc. (Kokosing) to perform construction work on the Hopple Street Bridge over I-75 in Hamilton County. Plaintiffs' claims are all based on the death of Brandon Carl (Mr. Carl), a Kokosing employee, who died during demolition work when part of the bridge collapsed. Plaintiff's complaint asserts claims for negligence, breach of warranty, survivorship, and wrongful death. The evidence that the parties submitted include a substantial amount of deposition testimony, documentary evidence, and affidavits including those from expert witnesses.

{¶3} Civ.R. 56(C) states, in part, as follows:

Summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed

in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. No evidence or stipulation may be considered except as stated in this rule. A summary judgment shall not be rendered unless it appears from the evidence or stipulation, and only from the evidence or stipulation, that reasonable minds can come to but one conclusion and that conclusion is adverse to the party against whom the motion for summary judgment is made, that party being entitled to have the evidence or stipulation construed most strongly in the party's favor.

*See also Dresher v. Burt,* 1996-Ohio-107, 75 Ohio St.3d 280 (1996). In *Dresher,* the Ohio Supreme Court held, "the moving party bears the initial responsibility of informing the trial court of the basis for the motion, and identifying those portions of the record before the trial court which demonstrate the absence of a genuine issue of fact on a material element of the nonmoving party's claim." A "movant must be able to point to evidentiary materials of the type listed in 56(C)." *Id.* at 292.

{¶4} When the moving party has satisfied its initial burden, Civ.R. 56(E) imposes a reciprocal burden on the nonmoving party. It states:

Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. Sworn or certified copies of all papers or parts of papers referred to in an affidavit shall be attached to or served with the affidavit. The court may permit affidavits to be supplemented or opposed by depositions or by further affidavits. When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon mere allegations or denials of his pleadings, but the

party's response, by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If the party does not so respond, summary judgment, if appropriate, shall be entered against the party.

In seeking and opposing summary judgment, parties must rely on admissible evidence. *Keaton v. Gordon Biersch Brewery Rest. Group*, 10th Dist. No. 05AP-110, 2006-Ohio-2438, 2006 Ohio App. Lexis 2287, ¶18.

**Facts**

{¶5} Pursuant to a contract with ODOT, Kokosing performed demolition work on ramp D of the Hopple Street bridge, over I-75 near Cincinnati on the night of January 19, 2015 when the ramp collapsed.[1] (Complaint ¶ 3-5; Deposition of Christopher Tuminello p. 58; Deposition of Michael McMann p. 51; 53-54). At the time, a Kokosing employee, Michael McMann (Mr. McMann), operated a track hoe to demolish the ramp. Michael Schweer acted as Kokosing's field engineer and supervisor. (Deposition of Michael Schweer p. 102). Mr. Carl stood twenty to twenty-five feet behind the track hoe to act as a spotter. As the track hoe moved east to west, the ramp collapsed and fell to the highway below carrying Mr. Carl and the excavator with it, killing Mr. Carl. (McMann depo. at p. 22; 34; 36; 38-40; 51; 53-54; 58; 85; 90; Schweer depo. p. 181). At the time, no one from ODOT was present. (Deposition of Timothy Short depo. p. 89).

{¶6} The night before the collapse, the Kokosing crew halted their work around midnight after noticing support beams were rising and lifting off the abutment in a "teetor totter" type fashion. (McMann depo. p. 42; 44; Schweer depo. p. 103; 107-08; Deposition of Christopher Murray p. 73; 76; Short depo. p. 73; Deposition of Vince

---

[1]The parties, in their briefs, and the witnesses, in their depositions and affidavits, use the terms bridge and ramp interchangeably. The court does so herein as well.

Martini p. 123). Mr. McMann testified he spoke with Mr. Carl and Mr. Schweer telling them, "what was going on and that I wasn't comfortable, that if we went any farther, that the bridge was going to fall." (McMann depo. p. 43; Schweer depo. p. 103).

{¶7} Mr. Schweer contacted Bret Murray, one of the Kokosing engineers who prepared the demolition plans. Mr. Murray designed a "tie-down" plan which called for anchoring the beams to prevent them from lifting. The tie-down work had been completed before Mr. McMann resumed the demolition shortly before the collapse on January 19, 2015. (McMann depo. p. 49; Murray depo. p. 73; 239; Schweer depo. p. 64; 70; 106; 182; Martini depo. p. 123).

{¶8} Prior to the collapse, Mr. Murray helped draft two sets of demolition plans, an original and revised set. Neither the original December 19, 2014 demolition plan nor the revised January 16, 2015 plan contained a sequence for demolition; they did not indicate where work should begin or in what order it should proceed. (Schweer depo. p. 84; Tuminello depo. p. 295; Deposition of Dennis Stemler p. 151-152; Murray depo. p. 69-70; 175; 212- 213; 216). Likewise, the tie-down plan did not dictate the sequence in which the sections should be removed. (Murray depo. p. 82). The demolition plans also failed to account for the fact that the ramp was "double hinged." (Murray depo. p. 71).

{¶9} The Kokosing crew decided on their own volition to begin demolition on the east and work west. (Deposition of Kelly Wessels depo. p. 143; 158; Short depo. p. 100; Martini depo. p. 60). Mr. Schweer testified, "we decided we would start on the east abutment and work our way to the west abutment" because "if * * * the excavator started on the east side, it would finish on the west side." He further testified:

Q. What was the importance of the machine starting on the east side?

A. Accessibility.

Q. Did the phrase * * * "maintenance of traffic" ever come into those discussions?

A. No.

* * *

Q. So the focus, at least in those meetings that you had, had to do with simply getting the machinery over to the east side, working toward the west, so you would be able to get it off, correct, sir?

A. Correct.

(Schweer depo. p. 88).

{¶10} After the collapse, Mr. Murray determined that the demolition work should have started with the center span to accomplish the work safely. (Murray depo. p. 125-126; 174-175). He testified, "I possibly made an engineering error" by "not starting" in the center span. (Murray depo. p. 58). Mr. Murray also testified that the lack of a demolition sequence was an "oversight." (Murray depo. p. 219-220). John Householder, Kokosing's vice president, admitted that the sequence in which the crew removed the deck played a role in the collapse as did the lack of a sequence for demolition in the demolition plans. (Deposition of John Householder p. 60-61; 86). In short, the collapse occurred because of the way in which Kokosing demolished the ramp, i.e. starting on the east end as opposed to starting in the center span. (Affidavit of Herbert Bill, Jr. ¶ 10-13). Because of the accident, Kokosing now pays a third-party engineer to review its demolition plans. (Householder depo. p. 124).

{¶11} Kokosing bore sole responsibility for designing the demolition plan and for the means and methods used to undertake the work. This responsibility included ensuring that the work was done safely. ODOT had no input into the demolition plans or Mr. Murray's tie down plan and provided no direction on how Kokosing should demolish the bridge. In fact, Mr. Murray testified he never spoke with anyone from ODOT when designing the demolition plans. (Murray depo. p. 24; 33; 229; 239; 244; 271; 273; Wessels depo. p. 80; 81; 123; Stemler depo. p. 59; 76; Tuminello depo. p. 21-

22; 39; 43; 85; 111-112; 119; 121; 134; 440; Ex. 50 thereto; Short depo. p.133; Martini depo. p. 207).

{¶12} Christopher Tuminello acted as ODOT's project engineer for the Hopple Street project. (Tuminello depo. p. 20). He testified that Kokosing engineers determined "what is required to complete [the] work." (Tuminello depo. p. 92). He continued, "[t]he contractor determines how they're gonna complete the work, when they're gonna complete the work and their means and methods to complete that work." (Tuminello depo. p. 217). Likewise, Mr. Kelly Wessels, then ODOT's Hamilton County resident engineer, testified, "Kokosing has a contract with [ODOT]. They are the preparer of the demolition plans * * * The contractor determines their means and methods. They develop a plan to demolition (sic) a bridge." (Wessels depo. p. 272).

{¶13} ODOT's acceptance of the demolition plans was not a contractual requirement. (Murray depo. p. 24; 33; 276). Mr. Tuminello was responsible for performing a cursory review of demolition drawings, checking to make sure the plans pertain to the right project, were received within the correct contractual timeframe, and contained the required stamps of two professional engineers. The demolition plans bore the required stamps. (Stemler depo. p. 60; 96-98; 102; 179; 181; 191; Wessels depo. p. 84; 92; 108; 117; 296; 301). However, Mr. Tuminello never saw the revised demolition plan before the collapse as it was submitted after he left work for the day on January 16, 2015. (Tuminello depo. p. 122; 250-251).

{¶14} Though ODOT provides parameters for maintenance of traffic (MOT) including disincentives and penalties for lane closures, Kokosing bore responsibility for designing the MOT plan. Kokosing used a third-party firm, GPD, to design the MOT plan. (Wessels depo. p. 31; 33; 145-46; Tuminello depo. p. 148-49; 215; 311). (Deposition of Stephen Mary p. 20, 85; 93; 134; Stemler depo. p. 28; Martini depo. p. 36; 199; 204). Mr. Wessels testified, the traffic closure penalties are not "directing Kokosing on what lanes will be closed and when they will be closed." (Wessels depo. p.

180).  Rather, the purpose of the MOT plan is "[t]o determine how traffic is going to be maintained throughout the project."  Among other items, it can address what lanes are closed or left open and for what times.  (Tuminello depo. p. 224).   Mr. Tuminello testified, "[t]he contractor is to design how they are gonna maintain traffic and how they're gonna accomplish the work per the contract."  (Tuminello depo. p. 150). Mr. Murray did not review the MOT plan when devising his demolition plans.  In fact, he was never provided with the MOT plan.  (Murray depo. p. 156-57; 274-275).  Certain lanes of I-75 remained open during demolition, which Mr. Murray testified was typical of such demolitions.  (Schweer depo. p. 91-92; Murray depo. p. 19-20; 178).   Mr. Martini testified that, if needed, lanes could have been closed or other options could have been utilized to remove the center span first which could have been done safely pursuant to the MOT.  (Martini depo. p. 206).

## Law and Analysis

{¶15} In *Cafferkey v. Turner Constr. Co.*, 21 Ohio St.3d 110, ¶ 1 of syllabus (1986), the Ohio Supreme Court held "[a] general contractor who has not actively participated in the subcontractor's work, does not, merely by virtue of its supervisory capacity, owe a duty of care to employees of the subcontractor who are injured while engaged in inherently dangerous work."  Although phrased as applicable to general contractors, this rule applies in general "to those who engage the services of an independent contractor or subcontractor" including ODOT.  *Krystalis v. Ohio DOT*, 10th Dist. No. 09AP-112, 2009 Ohio 3481, 2009 Ohio App. Lexis 3024, ¶ 11.  As stated in *Krystalis*, "[a]ctive participation means to direct 'activity which resulted in the injury and/or [to give or deny] permission for the critical acts that led to the employee's injury, rather than merely exercising a general supervisory role over the project.'"  *Id.  See also, Bond v. Howard Corp.,* 72 Ohio St.3d 332, 337 (1995).  In *Sopkovich v. Ohio Edison Co.*, 81 Ohio St.3d 628, 643 (1998), the Supreme Court stated the rule slightly

differently, finding "active participation * * * may be found to exist where a property owner either directs or exercises control over the work activities of the independent contractor's employees, or where the owner retains control over a critical variable in the workplace."

{¶16} These cases make clear that ODOT's supervisory role does not equate to active participation.  Rather, ODOT must have:  1) directed the activity which resulted in Mr. Carl's death, 2) given or denied permission for the critical acts that led to Mr. Carl's death, and/or 3) retained control over a critical variable in the workplace.  Plaintiff argues that ODOT retained control over a critical variable.  However, the court finds that ODOT has sustained its burden to demonstrate the absence of any genuine issue of material fact regarding ODOT's lack of active participation under all three theories of recovery.

{¶17} First, there is no dispute and, therefore, no genuine issue of material fact regarding ODOT's complete non-involvement in the means and methods used for demolition.  ODOT personnel were not involved whatsoever in the design of the demolition plans or in the actual demolition itself.  Rather, per the parties' contract, Kokosing bore sole responsibility for design and execution of the demolition plan. ODOT provided no direction on the equipment to be used, the number of workers involved, the sequence in which the bridge would be demolished or any other aspect of the work.  All instructions and decisions regarding the demolition came from Kokosing who directed its own employees, including Mr. Carl, on how to accomplish the work. There are simply no facts to establish that ODOT directed the work activity which resulted in Mr. Carl's death.

{¶18} Likewise, the court finds there is no genuine issue of material fact regarding ODOT's failure to give or deny permission for the critical acts leading to Mr. Carl's death.  The bridge collapsed because of the sequence in which it was demolished.  Thus, the critical act leading to Mr. Carl's death was the failure to include a

demolition sequence in the demolition plans and/or the decision to start work on the east side of the bridge and move west, neither of which involved decisions by ODOT. Kokosing engineers alone were responsible for the plan's lack of a demolition sequence and the Kokosing construction crew made the decision itself to start on the east side of the bridge and move west.  No one from Kokosing sought permission from ODOT and ODOT provided no input into these decisions.  In fact, Mr. Murray testified that he had no contact with ODOT personnel when designing the demolition plans.  Further, ODOT personnel were not present at the time of the collapse, had no knowledge of the beams lifting off the bridge abutment the night before the collapse, and also had no knowledge of Mr. Murray's tie-down plan.  There is no evidence that anyone from ODOT either granted or denied permission for any aspect of the sequence in which Kokosing demolished the bridge.

{¶19} Finally, the court also finds that ODOT did not retain control over any critical variable.  Plaintiff points to the MOT plan and contractual provisions which outlined parameters for traffic control, including penalties and disincentives associated with lane closures, in arguing that ODOT "exercised control over traffic" and that "ODOT's traffic mandate dictated how Kokosing could sequence the demolition of the bridge."   However, Mr. Murray testified that he was never provided with the MOT, which Kokosing itself designed, and Mr. Schweer testified that the MOT played no role in the crew's decision to start on the east side of the bridge.  Kokosing' s MOT called for lanes to remain open during demolition and Mr. Murray and Mr. Schweer both testified that it was typical to leave lanes of traffic open during demolition work.  Mr. Murray estimated he prepared around 300 demolition plans, 75% of which involved traffic remaining active while demolition took place.  (Murray depo. p. 19-20).  In fact, he could "not recall an interstate closure underneath an overhead bridge."  (Murray depo. p. 178).

{¶20} Mr. Martini also testified that lane closure or other options could have been used to remove the center span of the bridge first, both safely and pursuant to the MOT.

For instance, Mr. Martini testified an "up and over" plan, in which vehicles exit and then re-enter the highway via on and off ramps could have been used. ODOT witnesses testified that closure penalties do not direct Kokosing on which lanes to close and that Kokosing decides, through the MOT plan, how to maintain traffic and accomplish the work pursuant to the contract. No witness, from either Kokosing or ODOT, testified that the lane closure penalties or MOT plan had any effect whatsoever on the sequence of demolition. In short, though the contract provided parameters for the maintenance of traffic and penalties for certain lane closures, these parameters did not result in ODOT retaining any control over the flow of traffic nor did they influence either the design of the demolition work or the demolition work itself. No fact-witness with first-hand knowledge testified otherwise.

{¶21} The court finds ODOT sustained its burden to demonstrate an absence of a genuine issue of material fact regarding its lack of active participation in the demolition work. The court bases this finding on the numerous depositions of Kokosing and ODOT employees, cited and summarized *supra*. These depositions established that Kokosing bore sole and complete responsibility for all aspects of the demolition work. They also establish that Kokosing employees designed a demolition plan without a sequence for demolition and chose to begin demolition on the east side of the bridge instead of the center. The depositions are consistent in that Kokosing employees chose to continue with demolition in this manner despite observing the beams rising and falling the night before the collapse. Finally, the depositions are also consistent regarding ODOT's role; ODOT acted in a supervisory capacity only and played no role in Kokosing's demolition work.

{¶22} In seeking to demonstrate the existence of a genuine issue of material fact, plaintiff points to the affidavits of his expert witnesses, Dr. Herbert Bill, Jr. and Michael C. Wright. Dr. Bill opines that "the inability to stop traffic * * * for extended periods dictated that Kokosing start the demolition from the east and move * * * west."

(¶ 14). He indicates ODOT "ordered" Kokosing to use this approach. (¶ 15). He opines that the contract's parameters and penalties related to lane closures "controlled the means and methods that Kokosing could use to demolish the bridge and * * * compelled Kokosing to start demolition at the ends" and "forced Kokosing to start the demolition from the east end." (¶ 16). Dr. Bill further opines that lanes needed to be closed to allow demolition of the center span and that the limited lane closure time permitted by the contract did not allow "enough time to start the demolition by first removing the center span." (¶¶ 17-18; 20B). He further opines, "ODOT's stringent traffic flow requirements * * * dictated the sequencing of the bridge demolition and, therefore, ODOT actively and actually participated in the demolition of the bridge and exercised control over a critical construction/deconstruction variable" and that ODOT "controlled the means and methods" used to demolish the bridge. (¶ 20C). He states that the contract's parameters related to traffic "resulted in demolition * * * of the bridge in the wrong order." (¶ 20D).

{¶23} Mr. Wright opines that ODOT "actively participated in the construction and demolition project by exerting constant and persistent control over virtually every aspect of the project" and states "ODOT ordered Kokosing during demolition to keep traffic flowing beneath the bridge." (¶ 8-9). Pointing to contractual provisions outlining ODOT's supervisory authority, Mr. Wright opines that "ODOT, through its contractual power and daily involvement, actually exercised direction and control of the demolition and therefore it exercised control of Brandon Carl's safety." (¶ 12B). He further opines, "ODOT * * * determined how Kokosing would complete the work, when Kokosing would complete the work, and * * * dictated the means and methods that Kokosing could use to complete the work." (¶ 12C). The court finds that plaintiff's experts' affidavits do not create a genuine issue of material fact for the following reasons.

{¶24} First, plaintiff's experts' opinions regarding ODOT are conclusory, bare contradictions unsupported by any evidence and, therefore, they can not demonstrate

the existence of genuine issue of material fact.  In *White v. Sears*, 10th Dist. No. 10AP-294, 2011-Ohio-204, ¶ 9, the 10th District considered a similar situation.  In affirming summary judgment, the 10th District found, "a non-movant's own self-serving assertions, whether made in an affidavit, deposition or interrogatory responses, cannot defeat a well-supported summary judgment when not corroborated by any outside evidence."  In *White,* the court first cited *Bell v. Beightler*, 10th Dist. No. 02AP-569, 2003 Ohio 88, ¶ 33 wherein it stated:

> Generally, a party's unsupported and self-serving assertions, offered by way of affidavit, standing alone and without corroborating materials under Civ.R. 56, will not be sufficient to demonstrate material issues of fact. Otherwise, a party could avoid summary judgment under all circumstances solely by simply submitting such a self-serving affidavit containing nothing more than bare contradictions of the evidence offered by the moving party.

The *White* court also cited the following passage from *Greaney v. Ohio Turnpike Comm.*, 11th Dist. No. 2005-P-0012, 2005 Ohio 5284, ¶16:

> [A] non[-]moving party may not avoid summary judgment by merely submitting a self-serving affidavit contradicting the evidence offered by the moving party. * * * This rule is based upon judicial economy; [p]ermitting a non[-]moving party to avoid summary judgment by asserting nothing more than "bald contradictions of the evidence offered by the moving party" would necessarily abrogate the utility of the summary judgment exercise. * * * Courts would be unable to use Civ.R. 56 as a means of assessing the merits of a claim at an early stage of the litigation and unnecessarily dilate the civil process.

{¶25} Plaintiff's experts' opinions do not explain how they reached their conclusions despite the undisputed testimony by Mr. Murray that it was an oversight that the demolition plans contained no demolition sequence and that he did not look at the MOT plan when designing the demolition.  They do not explain their conclusions in light of the testimony of Mr. Schweer that the Kokosing construction crew chose to start demolition on the east side of the bridge for accessibility reasons and that the MOT plan played no role in the crew's decision.  They do not explain how Kokosing was forbidden from closing lanes despite the contract provisions which spoke only to the length of time a lane could be closed.  Most importantly, despite the substantial and consistent testimony by all witnesses that ODOT played no role in Kokosing's demolition design or the demolition itself, these experts nonetheless opine that ODOT actively participated in the demolition.

{¶26} Without any corroborating evidence, plaintiff's experts, in the most conclusory fashion, offer nothing more than bare contradictions of the other evidence in the case.  Though *White* and the cases cited therein considered affidavits and deposition testimony of a party, the court finds the law stated therein applies to the opinions of plaintiffs' experts in this case.  The character of the evidence plaintiff offers here is identical to that presented in *White* and the other cases, i.e. bare and conclusory contradictions of the factual testimony of every fact witness in the case.  In the court's view, it would make little sense to allow the plaintiff to perform an end-run around *White* and the cases cited therein and create an issue of fact based on expert affidavits containing the very sort of evidence as that rejected in these cases.  Plaintiff cannot demonstrate a genuine issue of material fact through expert opinions that do nothing more than contradict the facts to which every deponent consistently testified.

{¶27} In addition, plaintiff's experts, in opining that ODOT actively participated in the demolition, do not present facts but rather offer legal conclusions reflecting plaintiff's position on liability.  This court determines whether the facts establish that ODOT

actively participated in the demolition.   In *Blair v. City of Columbus Div. of Fire*, 10th Dist. No. 10AP-575, 2011-Ohio-3648, 2011 Ohio App. Lexis 3084, ¶ 33, the 10th District, in affirming summary judgment, found that an expert's opinion that appellees' actions constituted willful or wanton misconduct stated a legal conclusion and did not create an issue of material fact.   Rather, the court was required to analyze the underlying facts.   *See also Hackathorn v. Preisse*, 104 Ohio App.3d 768, 771-772 (9th Dist.1995) (Court first found "[a]n affidavit cannot state legal conclusions" before finding that two expert affidavits that opined that a person acted "recklessly" stated legal conclusions and did not create any issues of fact.).   In the present case, plaintiffs' experts reflect nothing more than plaintiffs' position regarding liability.   However, based on its review of the evidence, the court has accurately set forth the facts *supra*.

{¶28} In short, the court finds that plaintiffs' experts offer unsupported and bare contradictions of the evidence in this case and/or legal conclusions which do not establish the existence of any genuine issue of material fact regarding ODOT's lack of active participation.

{¶29} As ODOT has established an absence of any genuine issue of material fact regarding its lack of active participation, the court finds that its supervisory role entitles it to judgment as a matter of law.   Kokosing agreed to the contract's parameters and bore sole responsibility for the design and execution of all work the contract required including the demolition of Ramp D and the design of the MOT plan.   The contract's traffic flow mandates and lane closure penalties do not change the role or duty of the respective parties.   That Kokosing might incur penalties, even severe ones, for closing lanes does not equate to ODOT assuming more than a supervisory role.   Instead, Kokosing bore the responsibility to accomplish the work safely pursuant to the contract's parameters and requirements.   Kokosing could have designed a plan that included a demolition sequence.   Its crew could have begun demolition on Ramp D's center span. Its crew and engineers could have halted work when the bridge's beams began to rise

and fall the night before the collapse and taken a second and more thorough look at Ramp D's construction and Mr. Murray's demolition plan.  Regardless, Kokosing and its employees were solely responsible for all aspects of the work's design and execution while ODOT maintained a supervisory role at all times.

{¶30} Case law supports the court's finding that ODOT's supervisory role entitles it to summary judgment.  In *Krystalis,* ODOT hired a painting contractor, A & L Painting LLC, to repaint a bridge.  The plaintiff, a worker who sandblasted some of the steel on the bridge, contracted lead poisoning and sued ODOT for negligence based on its alleged failure to enforce safety policies and regulations. In upholding summary judgment for ODOT, the 10th District found that ODOT did not actively participate in the sandblasting reasoning:

> Only [plaintiff's] foreman told him what to do, and [plaintiff] reported work safety issues to his foreman * * * ODOT does not "tell the contractor how to * * * work."  (Bencivengo Depo. 21.)  To be sure, ODOT's inspectors gauged A&L's work for progress, quality, and contract fulfillment. However, this monitoring did not transform ODOT's role to active participation, but pertained to ODOT's general supervisory function. ODOT's contract provisions on worker safety also did not transform ODOT's role to active participation. Instead, ODOT required A&L to provide safety equipment for its workers in the containment and placed on A&L the responsibility to assure that its workers took proper safety precautions.

Here, as in *Krystalis*, ODOT had inspectors to ensure that Kokosing completed the bridge work according to contract specifications but none of them engaged in any conduct that could constitute actual participation in the work being performed. Likewise, like the contractual safety provisions in *Krystalis*, the contractual provisions

here related to lane closures did not transform ODOT's role into active participation; they simply placed an additional responsibility on Kokosing. *See also Cafferkey v. Turner Constr. Co.,* 21 Ohio St.3d 110, 112 (1986) (General contractor's retention over safety procedures does not equate to the kind of active participation required to create a duty of care to independent contractor's employees).

{¶31} In contrast, in *Hirschbach v. Cincinnati Gas & Electric. Co.,* 6 Ohio St.3d 206, (1983), an employee of an independent contractor died when a tower arm collapsed because of a tractor which was positioned too close to the tower. The property owner denied permission to the decedent and other employees to move the tractor prior to the accident. In reversing summary judgment in favor of the property owner, the Supreme Court found the property owner participated in the work because it retained and exercised control over the work area. *Id.* at 208. Likewise, in *Sopkovich*, Ohio Edison hired an independent contractor to paint an electric substation. One of the independent contractor's employees sustained severe injuries after being electrocuted. Ohio Edison decided daily which area of the substation would be de-energized to allow the painting work to be completed and also controlled the process of activating and de-activating the electricity. In reversing summary judgment for Ohio Edison, the Supreme Court found Ohio Edison actively participated because it retained and exercised "exclusive control over a critical variable in the working environment, i.e. the de-activation of specific electrical conductors in the work area."

{¶32} In the present case, ODOT's role is readily distinguishable from that of the defendants in *Hirschbach* and *Sopkovich*. ODOT did not have any active role in either the design or the demolition work itself. ODOT had no affirmative role whatsoever. It did not grant or deny permission to Kokosing as to any aspect of the demolition work, as in *Hirschbach*, nor did it take affirmative actions or make daily decisions regarding the work being performed as in *Sopkovich*. ODOT retained Kokosing to accomplish all work on the Hopple Street bridge project and played nothing more than a passive,

supervisory role.   As such, ODOT is entitled to summary judgment on all claims because it did not actively participate in the work and, therefore, owed no duty to Mr. Carl or any other Kokosing employee as a matter of law.

**Conclusion**

{¶33} Mr. Carl's death was tragic and regrettable.   However, as an employee of an independent contractor, ODOT owed Mr. Carl no duty absent evidence that it actively participated in the work.   There is no such evidence.   Rather, ODOT has pointed to evidence which establishes the absence of any genuine issue of material fact regarding Kokosing's responsibility for every aspect of the means and methods of the demolition work and which further establishes that ODOT acted only in a supervisory role.   Though plaintiff asserted both a negligence based claim and a breach of warranty claim in his complaint, plaintiff makes no mention of any warranty or of any duty owed to Mr. Carl apart from arguing that ODOT actively participated in the work.   Thus, as a matter of law, ODOT's lack of participation means that it owed no duty to Mr. Carl and, therefore, that it is entitled to summary judgment on all of plaintiff's claims.   For the reasons stated herein, the court shall grant ODOT's motion for summary and deny plaintiff's motion for partial summary judgment.

PATRICK M. MCGRATH
Judge

[Cite as *Clark v. Dept. of Transp.*, 2019-Ohio-3264.]

| | |
|---|---|
| MICHAEL A. CLARK, Admr. | Case No. 2015-00099JD |
| Plaintiff | Judge Patrick M. McGrath |
| v. | <u>JUDGMENT ENTRY</u> |
| OHIO DEPARTMENT OF TRANSPORTATION | |
| Defendant | |

{¶34} For the reasons set forth in the decision filed concurrently herewith, defendant's motion for summary judgment is GRANTED and plaintiff's motion for partial summary judgment is DENIED. Judgment is rendered in favor of defendant. All previously scheduled events are VACATED. Court costs are assessed against plaintiff. The clerk shall serve upon all parties notice of this judgment and its date of entry upon the journal.

PATRICK M. MCGRATH
Judge

Filed July 10, 2019
Sent to S.C. Reporter 8/15/19